UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

DEANNA LETRAY,

                Plaintiff,

        v.

JEFFERSON COUNTY; CITY OF
WATERTOWN; COLLEEN O'NEILL, Jefferson
County Sheriff; KRISTOPHER M. SPENCER;
JOEL DETTMER; CHARLES DONOGHUE, City
of Watertown Police Chief; GEORGE
CUMMINGS; SAMUEL WHITE; DEBORAH
DAVIS and PATRICK LARKINS,

                Defendants.

20-CV-1194 (GLS)(TWD)

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION & CROSS-MOTION FOR SUMMARY JUDGMENT & IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT ON BEHALF OF CHARLES DONOGHUE & THE CITY OF WATERTOWN**

NEW YORK CIVIL LIBERTIES UNION
   FOUNDATION

Jessica Perry (702461)
Veronica Salama (703812)
Robert Hodgson (518648)
Molly K. Biklen (4295390)
125 Broad Street, 19th Floor
New York, New York 10004
Tel: +1 (212) 607-3300
Fax: +1 (212) 607-3318
E-mail: jperry@nyclu.org
      vsalama@nyclu.org
      rhodgson@nyclu.org

Dated: December 16, 2022
   New York, NY

LEGAL SERVICES OF CENTRAL NEW
   YORK, INC.

Joshua Cotter (518217)
Samuel C. Young (508916)
221 South Warren Street, 3rd Floor
Syracuse, New York 13202
Tel: +1 (315) 703-6500
Fax: +1 (315) 703-6520
E-mail: jcotter@lscny.org
      samyoung@lscny.org

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................................ 1

ARGUMENT ................................................................................................................................. 5

I.       SUMMARY JUDGMENT IS WARRANTED ON PLAINTIFF'S FOURTH
AMENDMENT CLAIM BECAUSE THE JAIL HAS A BLANKET STRIP
SEARCH POLICY REGARDLESS OF REASONABLE SUSPICION. ............. 6

        A.     Subjecting a Misdemeanor Arrestee Not in General Population to a Visual
Body Cavity Search Without Reasonable Suspicion is Unconstitutional... 6

        B.     Summary Judgment is Appropriate as to Sergeant Dettmer and Jefferson
County. ..................................................................................................... 9

        C.     Defendants Colleen O'Neill and Kristopher Spencer are Personally Liable
for the Creation of the Unconstitutional Strip Search Policies. ............... 10

        D.     The City of Watertown and Chief Donoghue are Liable for WPD's Policy
of Entrusting the Care of Arrestees to Jefferson County. ........................ 10

II.      SUMMARY JUDGMENT FOR WPD ON MS. LETRAY'S EQUAL
PROTECTION AND CRL § 40-C CLAIMS IS PRECLUDED BY MATERIAL
FACTUAL DISPUTES. ................................................................................. 14

        A.     Regarding Ms. LeTray's Federal & State Equal Protection Claims, WPD
Relies on Inapposite False Arrest and Malicious Prosecution Doctrine... 14

        B.     There Are Genuine Factual Disputes About Whether WPD Violated
Plaintiff's Equal Protection Rights Precluding Summary Judgment. ....... 15

             i.     A Reasonable Jury Could Conclude that Defendants Treated
Plaintiff Differently Than Cisgender People Who Are Detained
Pre-Trial. ...................................................................................... 15

             ii.    Heightened Scrutiny Applies. ....................................................... 19

             iii.   Watertown Defendants Assert No Interest Whatsoever in the
Differential Treatment of Transgender Arrestees and Thus Fail
Heightened Scrutiny. .................................................................... 20

             iv.   A Reasonable Jury Could Conclude That the City of Watertown is
Liable for Equal Protection Violations Under Monell. ................. 21

i

C.    On Ms. LeTray's Eighth Claim, WPD Is Not Entitled to Summary Judgment Because There Are Genuine Factual Disputes About Whether WPD Violated New York State Civil Rights Law § 40-c. ...................... 22

III.   INJUNCTIVE RELIEF IS AN APPROPRIATE REMEDY ............................... 24

CONCLUSION ........................................................................................................... 25

## TABLE OF AUTHORITIES

*Adkins v. City of New York*, 143 F. Supp. 3d 134 (S.D.N.Y. 2015) ...........................14, 15, 13, 19

*Ali v. Connick*, 136 F. Supp. 3d 270 (E.D.N.Y. 2015)....................................................................16

*Ancata v. Prison Health Services, Inc.*, 769 F.2d 700 (11th Cir. 1985) .......................................12

*Aurecchione v. New York State Div. of Hum. Rts.*, 771 N.E.2d 231 (N.Y. 2002) ........................23

*Baskerville v. Goord,* No. 97–CV–6413, 1998 WL 778396 (S.D.N.Y. Nov. 5, 1998) *aff'd sum nom. Baskerville v. Mulvaney,* 411 F.3d 45 (2d Cir. 2005) ...............................................16

*Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731 (2020) .....................................................19, 20, 23

*Brown v. State*, 89 N.Y.2d 172 (1996)...........................................................................................15

*Bryant v. Maffucci*, 729 F. Supp. 319 (S.D.N.Y. 1990)..................................................................11

*Cantley v. W.V. Reg'l Jail & Corr. Facility Auth.*, 771 F.3d 201 (4th Cir. 2014) ...........................8

*Carter v. Broome Cnty.,* 394 F. Supp. 3d 228 (N.D.N.Y. 2019) ....................................................11

*City of Cleburne v. Cleburne Living Center,* 473 U.S. 432 (1985) ................................................15

*Cole v. Fischer*, 379 F. App'x 40 (2d Cir. 2010) ...........................................................................16

*de la Torre v. LA. Plata Cnty.,* No. 21-cv-01422-CMA-NRN, 2022 WL 1193471 (D. Colo. Feb. 11, 2022) ..............................................................................................................................12

*Deshawn v. Safir*, 156 F.3d 340 (2d Cir.1998) ..............................................................................24

*Doe v. City of New York*, 42 Misc. 3d 502 (N.Y. County Sup. Ct. 2013) ...............................23, 24

*Doe v. Mass. Dep't of Corr.*, No. 17-12255-RGS, 2018 WL 2994403 (D. Mass. June 14, 2018) ........................................................................................................................16, 20

*Duamutef v. Morris*, 956 F. Supp. 1112 (S.D.N.Y. 1997)......................................................14, 15

*Ellsworth v. Wachtel*, No. 1:11-CV-0381(LEK/CFH), 2013 WL 140342 (N.D.N.Y. Jan. 11, 2013) ........................................................................................................................................8

*Fabian v. Hosp. of Cent. Conn.*, 172 F. Supp. 3d 509 (D. Conn. 2016).......................................20

*Fate v. Charles*, 24 F. Supp. 3d 337 (S.D.N.Y. 2014)....................................................................8

*Ford v. City of Bos.*, 154 F. Supp. 2d 131 (D. Mass. 2001)................................................. *passim*

*Florence v. Bd. of Chosen Freeholders of the Cnty. of Burlington*, 566 U.S. 318 (2012) .... *passim*

*Fonder v. Sheriff of Kankakee Cnty.*, 823 F.3d 1144 (7th Cir. 2016) .............................................8

*Gil v. Vogilano*, 131 F. Supp.2d 486 (S.D.N.Y. 2001) ...................................................................11

*Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011) .......................................................................20

*Gordon v. PL Long Beach, LLC*, 74 A.D.3d 880 (2d Dept. 2010) ................................................23

*Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020) ...............................................................................................................................20, 23, 24, 25

*Hartline v. Gallo*,  546 F.3d 95 (2d Cir. 2008) ...............................................................................9

*Hampton v. Baldwin*, No. 3:18-CV-550-NJR-RJD, 2018 WL 5830730 (S.D. Ill. Nov. 7, 2018) ......................................................................................................................................16, 20

*Heck v. Humphrey*, 512 U.S. 477 (1994) ...............................................................................14, 15

*Hernandez v. Robles*, 7 N.Y.3d 338 (2006) ..................................................................................15

*Hinkle v. Beckham Cnty. Bd. of Cnty. Commissioners,* 962 F.3d 1204 (10th Cir. 2020) ...............8

*In re Nassau Cnty. Strip Search Cases*, 639 F. App'x 746 (2d Cir. 2016) .....................................7

*In re New York City Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383 (S.D.N.Y. 2021) .............................................................................................................................10

*Mary Beth G. v. City of Chicago*, 723 F.2d 1263 (7th Cir. 1983) ...................................................9

*McClellan v. Smith*, 439 F.3d 137 (2d Cir. 2006) ...........................................................................6

*Monell v. Dep't of Soc. Services of City of New York,* 436 U.S. 658 (1978) ......................9, 21, 22

*Oliver v. Tepperman*, No. 08-CV-3685 (RRM)(LB), 2010 WL 889276 (E.D.N.Y. 2010) .....14, 15

*Outlaw v. City of Hartford*, 884 F.3d 351 (2d Cir. 2018) .............................................................21

*Patterson v. Cnty. of Oneida*, 375 F.3d 206 (2d Cir. 2004) .........................................................13

*Phillips v. Girdich,* 408 F.3d 124 (2d Cir. 2005) ..........................................................................15

*Poole v. Hawkins*, No. 18-CV-443 (MKB), 2021 WL 695119 (E.D.N.Y. 2021) .........................19

*Pratt v. Indian River Cent. Sch. Dist.*, 803 F. Supp. 2d 135 (N.D.N.Y. 2011) .............................22

*Schroer v. Billington*, 577 F. Supp. 2d 293 (D.D.C. 2008) ...........................................................20

*Schwenk v Hartford*, 204 F.3d 1187 (9th Cir. 2000) .....................................................................20

*Smith v. City of Salem, Ohio,* 378 F.3d 566 (6th Cir. 2004) ..........................................................20

*Sloley v. Vanbramer*, 945 F.3d 30 (2d Cir. 2019) ............................................................................9

*Stone #1 v. Annucci*, No. 20-CV-1326 (RA), 2021 WL 4463033 (S.D.N.Y. Sep. 28, 2021)........10

*Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020) ....................................................................10

*Titus v. Cnty. of L.A.,* No. CV 06-3690 (SVW)(AJW), 2006 WL 8443072 (C.D. Cal. Oct. 18, 2006) ..............................................................................................................................12

*Trujillo v. City & Cnty. of Denver*, No. 14-cv-02798-RBJ-MEH, 2016 WL 5791208 (D. Colo. Sept. 7, 2016) ........................................................................................................................12

*United States v. Virginia*, 518 U.S. 515 (1996) ..............................................................14, 19, 20

*Vega v. Artus*, 610 F. Supp. 2d 185 (N.D.N.Y. 2009) .............................................................15, 16

*Viola v. Philips Med. Sys. of N. Am.,* 42 F.3d 712 (2d Cir. 1994) .....................................................6

*Weber v. Dell*, 804 F.2d 796 (2d Cir. 1986) ...........................................................................6, 7, 8, 21

*Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017) ............................................................................................................................20

*Willey v. Kirkpatrick*, 801 F.3d 51 (2d Cir. 2015) .........................................................................17

*Williams v. Cnty. of Niagara*, No. 06-CV-291-A, 2019 WL 95822 (W.D.N.Y. Jan. 3, 2019)........8

*Wilson v. Phoenix House*, 42 Misc. 3d 677 (N. Y. County Sup. Ct. 2013) .............................23, 24

*Wray v. City of New York*, 490 F.3d 189 (2d Cir. 2007).................................................................21

*Young v. City of Little Rock*, 249 F.3d 730 (8th Cir. 2001) ......................................................11, 12

## Statutes, Rules and Regulations

9 N.Y.C.R.R. § 466.13...................................................................................................................22

N.Y. Crim. Proc. Law § 140.20 .....................................................................................................13

## Other Authorities

Deadname, Merriamwebster.com, https://www.merriam-webster.com/dictionary/deadname (last visited December 14, 2022) .................................................................................................3

## PRELIMINARY STATEMENT

It is undisputed that Jefferson County Jail maintains a strip-search policy that subjects all Watertown Police Department arrestees, including Plaintiff DeAnna LeTray, to an invasive visual body cavity search without reasonable suspicion even though arrestees are never admitted to the jail's general population. Accordingly, Ms. LeTray is entitled to summary judgment as a matter of law on her claim that this blanket policy violates the Fourth Amendment.

By contrast, each claim on which the WPD Defendants (collectively, "WPD") seek summary judgment hinges on key factual disputes regarding Ms. LeTray's account of being degraded, humiliated, and targeted for abuse and differential treatment by WPD because she is a transgender woman. In moving for summary judgment, WPD mischaracterizes Ms. LeTray's account and fails to acknowledge that their version of events is not what the Court must accept at this stage. A reasonable jury could conclude that WPD discriminated against Ms. LeTray in violation of the federal and state Equal Protection Clauses and New York Civil Rights Law Section 40-c. Accordingly, WPD is not entitled to summary judgment on these claims.

Finally, WPD argues that there is no basis for Ms. LeTray's claim for injunctive relief seeking a correction of her arrest records to accurately reflect her gender identity. But, if she prevails, Ms. LeTray's request is a reasonable and permissible remedy.

## FACTUAL BACKGROUND

Ms. LeTray has provided a comprehensive response to WPD's Statement of Material Facts and Counterstatement Pursuant to Rule 56.1 (hereinafter, "Pl. 56.1") and summarizes the most relevant facts here.

1

***Ms. LeTray***

DeAnna LeTray is a 56-year-old transgender woman. Pl. 56.1 ¶ 47.[1] From a young age, Ms. LeTray knew that she was a girl, and starting in 2010, she began living in her affirmed female gender by wearing women's clothing, putting on make-up, wearing her hair in a feminine style, and using the name "DeAnna" in the parts of her life where it felt safe and possible to do so. *Id.* ¶¶ 47-52. This process, known as "social role transition," is a common feature of the standards of care for people like Ms. LeTray who have been diagnosed with gender dysphoria. *Id.* ¶ 54. "Social role transition" may not happen all at once—some individuals begin outwardly presenting themselves in a manner consistent with their gender identity only in certain situations or with certain people due to reasonable fears for their safety. *Id.* ¶¶ 53-54.

***WPD's Discriminatory Treatment of Ms. LeTray During Her Arrest.***

On the night of September 28, 2017, Ms. LeTray's gender presentation was that of a woman. *Id.* ¶ 80. Specifically, she was wearing a long red wig, which she considered to be her hair, prosthetic breasts, makeup, and women's clothing, and she was carrying a pink pleather purse. *Id.* ¶¶ 80-81. Each of these items was an important part of her gender identity and expression. *Id.*

That night, Ms. LeTray had a domestic dispute outside of the Watertown home of her ex-wife, daughter, and her daughter's boyfriend, Josh Coffey, where Coffey threatened Ms. LeTray with a shotgun. *Id.* ¶¶ 82-88. Shortly after this dispute, as Ms. LeTray hurried away to escape his threats, WPD officers appeared at Mr. Coffey's home in response to a disturbance call. *Id.* ¶¶ 88-89. As Officer George Cummings was securing Coffey's shotgun, Coffey pointed Officer Samuel White in the direction that Ms. LeTray had gone and stated that "he" was the problem.

---

[1] A transgender person is one whose gender identity differs from their birth-assigned sex. Pl. 56.1 ¶ 48.

*Id.* ¶¶ 92-95. Coffey used male pronouns when referring to Ms. LeTray, but Officer White stated that the person he was pursuing—Ms. LeTray—appeared to be a female. *Id.* ¶¶ 95-96. After Officers White and Cummings stopped Ms. LeTray, she provided both the name that appeared on her government-issued identification and the name "DeAnna LeTray," and she stated that she was a transgender woman. *Id.* ¶¶ 99, 101. Officer Cummings called her a liar, told her she was a "guy" and a "man dressed like a woman," and asked her, "how long have you dressed like that?", in addition to other questions about her sexuality and genitalia. *Id.* ¶ 101. At the end of the interview, Officer Cummings asked Ms. LeTray how she planned on getting home, indicating that she would be allowed to leave. *Id.* ¶ 102. However, when she stated that she would walk, he told her, "We can't let you walk the streets looking and dressed like that," and at that point, the officers arrested her. *Id.* ¶¶ 102-03. In the car, Officer Cummings told Ms. LeTray, "You have serious mental problems—you are a guy dressed like a woman." *Id.* ¶ 103. One of the officers who later appeared on the scene stated over the WPD radio that the subject of the disturbance call was a "transvestite." *Id.* ¶ 91.

### WPD's Discriminatory Treatment of Ms. LeTray During Booking.

At the WPD public safety building, officers then ordered Ms. LeTray to remove her wig for her booking photo because "sitting before me was [Plaintiff's deadname], who was a male, and . . . I wanted an accurate depiction of [Plaintiff's deadname]."[2] *Id.* ¶ 122. Ms. LeTray was distraught because her wig, which she considers to be her hair, is a significant part of her gender identity and expression and the thought of being photographed without it, especially while she still had her makeup on, was humiliating. *Id.* ¶ 123. The WPD does not have a written policy that

---

[2] The term "deadname" refers to "the name a transgender person was given at birth and no longer uses upon transitioning." Deadname, MERRIAMWEBSTER.COM, https://www.merriam-webster.com/dictionary/deadname (last visited December 14, 2022).

requires the removal of synthetic hair or a wig for booking photos, and women wearing synthetic hair in the form of a weave are not required to remove it for booking photos. *Id.* ¶ 116, 118. Officer Cummings also testified that, while he could have offered Ms. LeTray the opportunity to take booking photos both in and out of her wig, he did not do so before forcibly removing it. *Id.* ¶¶ 117, 128. Officer Cummings' removal of the clipped-in wig ripped some of Ms. LeTray's natural hair from her scalp. *Id.* ¶ 128. As Ms. LeTray attempted to retrieve her hairclip from the nearby table, Officers Cummings and White forcibly slammed Ms. LeTray to the ground and put her in painful restraints. *Id.* While both officers transported her to the Jefferson County Jail, Officer Cummings told her that "we are going to show you that you are a man," that "you are going to the jail and get strip searched," and that "you're going to love that." *Id.* ¶ 131.

**WPD's Discriminatory Policies and Practices.**

Chief Charles Donoghue, who sets WPD policy on all operational matters, *id.* ¶ 59, testified that, for the purposes of all policies that treat people in custody differently based on sex, a transgender woman "is a male," *id.* ¶ 75. There are no trainings to instruct WPD officers on the constitutional treatment of transgender people. *Id.* ¶¶ 60, 68-69. Accordingly, when Officers Cummings and White repeatedly misgendered Ms. LeTray, subjected her to differential treatment based on her gender identity, and classified her in WPD arrest reports as "male," *id.* ¶ 106, they were acting pursuant to the policies of the WPD and had not been trained to act otherwise, *id.* ¶¶ 59-71.

**Undisputed Facts Related to Jefferson County's Search.**

Pursuant to an existing agency agreement, WPD arrestees like Ms. LeTray are held at the Jefferson County Jail alone in their own holding cells until they can be arraigned. *Id.* ¶¶ 138-142. With the City of Watertown, Jefferson County developed a series of policies to govern the

treatment of WPD arrestees held at the Jail. *Id.* ¶¶ 144-154. The policies mandate that all WPD arrestees undergo a strip search and visual body cavity search before they are brought to their holding cell, with no individualized inquiry into the need for such a search. *Id.* The highly invasive search requires arrestees to strip naked, bend over, and spread their cheeks to expose their rectum. *Id.* Then the arrestee is ordered to stand up and manipulate their genitals so they can be inspected. *Id.*

Pursuant to this blanket policy, Sergeant Joel Dettmer conducted a visual body cavity search of Ms. LeTray when she arrived at the Jefferson County Jail. *Id.* ¶ 179. He ordered Ms. LeTray to remove her clothing layer by layer, bend over, expose her rectum, and move her genitalia, which she did. *Id.* ¶ 180. After the search, pursuant to policy, Dettmer placed Ms. LeTray in a holding cell by herself, in the designated WPD arrestee section of the booking area of the jail, where she remained until her release the next morning. *Id.* ¶ 181-182. That night, Ms. LeTray was so distraught by Defendants' treatment of her that she contemplated suicide. *Id.* ¶ 183. Since that night, Ms. LeTray has suffered from severe post-traumatic stress disorder, depression, and anxiety. *Id.*

## ARGUMENT

Ms. LeTray is entitled to summary judgment on her Fourth Amendment Claim—the First Cause of Action—against Jefferson County, Sheriff O'Neill, Jail Administrator Spencer, and Sergeant Dettmer, *see* Compl. ¶¶ 72-75, because the undisputed facts establish that these Defendants subjected her to Jefferson County Jail's blanket visual body cavity search policy, which was unconstitutional as a matter of law. She is also entitled to summary judgment on her First Cause of Action against the City of Watertown and Chief Donoghue because of their policy of sending WPD arrestees to the Jail knowing they would be subjected to an unconstitutional

strip search. Summary judgment is appropriate where, as here, admissible evidence demonstrates the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.,* 42 F.3d 712, 716 (2d Cir. 1994).

In addition to seeking to dismiss her First Cause of Action, WPD seeks summary judgment on Ms. LeTray's federal and state Equal Protection and Civil Rights Law ("CRL") Section 40-c claims—the Sixth, Seventh, and Eighth Causes of Action, WPD Br. at 9-13, Compl. ¶¶ 72-77, 92-107—despite the existence of critical factual disputes, including conflicting evidence at the heart of her discrimination claims regarding what Defendants said about Ms. LeTray's gender identity and whether they targeted her for harassment, abuse, and violence on that basis. Summary judgment is not appropriate where, as here, there is a "genuine issue as to any material fact" deriving from "the evidence [being] such that a reasonable jury could return a verdict for the nonmoving party," *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (internal citation and quotation omitted) (alteration in original), and WPD's motion should be denied.

I.   **SUMMARY JUDGMENT IS WARRANTED ON PLAINTIFF'S FOURTH AMENDMENT CLAIM BECAUSE THE JAIL HAS A BLANKET STRIP SEARCH POLICY REGARDLESS OF REASONABLE SUSPICION.**

A.  **Subjecting a Misdemeanor Arrestee Not in General Population to a Visual Body Cavity Search Without Reasonable Suspicion is Unconstitutional.**

In *Weber v. Dell*, the Second Circuit held that people arrested for misdemeanors cannot be subjected to a strip search that includes a visual body cavity search absent reasonable suspicion they are secreting contraband. 804 F.2d 796, 801-02 (2d Cir. 1986). Acknowledging that a visual body cavity search is "degrading" and a "major invasion into privacy," *id.* at 803, the court held that the "Fourth Amendment precludes prison officials from performing strip/body cavity searches of arrestees charged with misdemeanors or other minor offenses unless the officials have a reasonable suspicion that the arrestee is concealing weapons or other contraband

based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest," *id.* at 802. Ultimately, the court concluded that "[d]eference" to jail officials "is not a dispensation from the requirement under the Fourth Amendment that searches be reasonable." *Id.* at 804.

In *Florence v. Board of Chosen Freeholders of the County of Burlington*, the Supreme Court partly overruled *Weber*, but it did so in a narrow holding that only applies to people admitted to the *general population* of a jail or prison. *See* 566 U.S. 318, 333-34, 339 (2012). The *Florence* Court explicitly did not decide whether the Constitution prohibits strip searches of people who, like Ms. LeTray, are not placed in general population and will therefore not be held with other individuals who are detained. *Id.* at 338-39 (plurality). In fact, a majority of the Justices in *Florence* indicated that subjecting an arrestee charged with a misdemeanor or other minor offense to the "humiliation of a strip search" may be unconstitutional, *id.* at 341-42 (Alito, J.) (concurring) (emphasizing the special case of those "apart from the general population"); *id.* at 339 (Roberts, C.J.) (concurring) (also emphasizing those not confined in general population); *id.* at 355 (Breyer, J.; joined by Ginsburg, Kagan, and Sotomayor, JJ) (dissenting) ("I cannot find justification for . . . a policy that would subject those arrested for minor offenses" to strip searches.). Thus, the *Florence* Court was careful not to overrule the applicability of *Weber* for those who, like Ms. LeTray, were charged with minor offenses and never admitted to a jail's general population.

While the Second Circuit has not squarely addressed a case like Ms. LeTray's post-*Florence*, it has confirmed that "the Supreme Court indicated that categorically strip-searching . . . detainees charged with misdemeanors and segregated *alone* from the general population" may "not pass constitutional muster." *In re Nassau Cnty. Strip Search Cases*, 639 F. App'x 746,

750-751 (2d Cir. 2016) (summary order) (emphasis in original). District courts in this Circuit have similarly recognized that *Florence* does not apply to people not placed in general population. *See Ellsworth v. Wachtel*, No. 1:11-CV-0381(LEK/CFH), 2013 WL 140342, at *6 (N.D.N.Y. Jan. 11, 2013) (Kahn, J.) (holding that "*Florence* is inapposite" because plaintiff was not in "a general jail population"); *see also Fate v. Charles*, 24 F. Supp. 3d 337, 346 (S.D.N.Y. 2014) (recognizing *Florence* does not apply when an arrestee is not assigned to general population in a jail); *Williams v. Cnty. of Niagara*, No. 06-CV-291-A, 2019 WL 95822, at *6 (W.D.N.Y. Jan. 3, 2019) (noting the *Florence* exceptions).

Since *Florence* is "inapposite," *Ellsworth*, 2013 WL 140342, at *6, this Court should find that the persuasive reasoning of *Weber* continues to apply outside the general population context to preclude a jail from instituting a blanket suspicionless visual body cavity search policy, *see Weber,* 804 F.2d at 801-02. At least one sister circuit has recently so held when confronted with this precise issue, *see Hinkle v. Beckham Cnty. Bd. of Cnty. Commissioners,* 962 F.3d 1204, 1235 (10th Cir. 2020) (considering a blanket visual body cavity search policy and holding that "*Florence* Does Not Sanction the County's Policy of Body-Cavity Strip Searching All Detainees"), and two others indicated they would do the same if presented with the facts at issue here, *see Cantley v. W.V. Reg'l Jail & Corr. Facility Auth*., 771 F.3d 201, 208 (4th Cir. 2014) ("*Florence* made clear that blanket strip searches prior to arraignment of arrestees not designated for assignment to the detention facility's general population are constitutionally suspect in the absence of some particularized justification"); *Fonder v. Sheriff of Kankakee Cnty*., 823 F.3d 1144, 1146 (7th Cir. 2016) (stating that people arrested, detained, strip searched, and released without being placed in general population have good claims that their rights were violated).

**B. Summary Judgment is Appropriate as to Sergeant Dettmer and Jefferson County.**

It is undisputed that Jefferson County policy requires jail officials to perform a visual body cavity search on every WPD arrestee placed in their custody, regardless of whether reasonable suspicion for such a search exists. Pl. 56.1 ¶ 152-154. These searches "are invasive and degrading, occasioning a serious invasion of privacy and working a significant harm to a person's bodily integrity." *Sloley v. Vanbramer*, 945 F.3d 30, 38 (2d Cir. 2019); *accord Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1272 (7th Cir. 1983) (Visual body cavity searches are "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission."). It is also undisputed that WPD arrestees are not admitted to the general population of the Jail. Pl. 56.1 ¶ 143. Sergeant Dettmer performed a visual body cavity search on Ms. LeTray pursuant to the Jail's policy and made no inquiry into whether there was reasonable suspicion to perform the search on Ms. LeTray.[3]

These undisputed facts establish that Jefferson County's blanket policy of performing highly invasive visual body cavity searches on every WPD arrestee without assessing reasonable suspicion violates the Fourth Amendment. *See supra* Part I(a). Accordingly, liability lies with both Sergeant Dettmer as the officer who conducted the unconstitutional search and with Jefferson County because he conducted the search pursuant to formal "official municipal policy." *See Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658, 691 (1978). This Court should therefore enter judgment against Dettmer and Jefferson County on Ms. LeTray's Fourth Amendment claim as a matter of law.

---

[3] Even if he had made such an inquiry, according to his own testimony there was nothing from Ms. LeTray's behavior that would have led him to believe she was hiding a weapon or contraband in her body cavities. *See* Pl. 56.1 ¶ 176; *see also Sloley v. Vanbramer*, 945 F.3d 30, 39 (2d Cir. 2019) (holding visual body cavity searches "must be based on reasonable suspicion to believe that the arrestee is secreting evidence inside the body cavity to be searched."); *see also Hartline v. Gallo*, 546 F.3d 95, 101 (2d Cir. 2008) (holding a woman's arrest for a misdemeanor drug offense did not give police reasonable suspicion to strip search her).

### C. Defendants Colleen O'Neill and Kristopher Spencer are Personally Liable for the Creation of the Unconstitutional Strip Search Policies.

A supervisory official may be held liable when a plaintiff "prove[s] the elements of the underlying constitutional violation directly against the official." *Tangreti v. Bachmann*, 983 F.3d 609, 620 (2d Cir. 2020). A direct constitutional violation exists when a law enforcement official personally approved the policy or practice that is the source of the constitutional violation or was personally involved in its creation. *See, e.g.*, *In re New York City Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383, 410 (S.D.N.Y. 2021) (holding that a direct violation was pled when a police chief "personally approved" the challenged tactic, when a mayor "was personally involved in the development of the [challenged] tactics," and when he "personally approved the strategies" challenged by the plaintiffs).

Here, Jail Administrator Spencer was directly involved in the creation, dissemination, and enforcement of the strip search policies at issue. Pl. 56.1 ¶ 156. Sheriff O'Neill is the final signatory on all Jefferson County Jail policies, *id.* ¶ 159, and she reviewed and personally approved the strip search policies Ms. LeTray challenges. *Id.* ¶ 160. Additionally, Defendants Spencer and O'Neill have knowingly allowed the unconstitutional blanket strip searches of WPD arrestees to continue for the duration of their tenures. *See Stone #1 v. Annucci*, No. 20-CV-1326 (RA), 2021 WL 4463033, at *11 (S.D.N.Y. Sep. 28, 2021) (recognizing that allowing the continuance of an unconstitutional policy is sufficient to establish liability) (internal citations omitted). Defendants Spencer and O'Neill were directly involved in and are therefore liable for Ms. LeTray's constitutional injuries.

### D. The City of Watertown and Chief Donoghue are Liable for WPD's Policy of Entrusting the Care of Arrestees to Jefferson County.

On Plaintiff's First Cause of Action, summary judgment is also appropriate against the City of Watertown and Chief Donoghue. A plaintiff can establish liability against a municipality

10

that delegates custody of arrestees to a county jail by showing that the municipality knew or should have known the arrestees would be subjected to a constitutional violation. *See Ford v. City of Bos.*, 154 F. Supp. 2d 131, 150 (D. Mass. 2001) (granting summary judgment in favor of plaintiff challenging jail's strip search policy and holding "there can be no question that the City's liability in damages for Jail violations of BPD arrestees' Fourth Amendment rights is coextensive with that of the County"). Here, as in *Ford*, the City of Watertown and Chief Donoghue are liable because, pursuant to undisputed WPD policy, they knew or should have known that Ms. LeTray would be subjected to the Jail's unconstitutional strip search.

Courts in this Circuit have routinely confirmed that "a municipality's duty" to care for those who are incarcerated "is non-delegable and is not absolved by contracting with a third party." *Gil v. Vogilano*, 131 F. Supp.2d 486, 493 (S.D.N.Y. 2001); *see also Carter v. Broome Cnty.,* 394 F. Supp. 3d 228, 241-42 (N.D.N.Y. 2019) (contracting out "care does not relieve the State of its constitutional duty" to those it took into its custody); *Bryant v. Maffucci*, 729 F. Supp. 319, 324 (S.D.N.Y. 1990) (corrections department "may not avoid liability by delegating" its duty of care).

The district court's decision in *Ford* is particularly instructive. It involves a strikingly similar "express agreement between the City and the County Sheriff, under which the County agreed to 'take custody of and house' BPD arrestees at the Jail," establishing the city's "affirmative obligation . . . to ensure that the [strip-search] policy of the Jail officials did not lead to widespread violation of BPD arrestees' constitutional rights." 154 F. Supp. 2d at 148-49. It also collects persuasive case law from multiple circuits in support of its analysis. *Id.* at 149 (citing *Young v. City of Little Rock*, 249 F.3d 730, 736 (8th Cir. 2001) (upholding a jury verdict that found a city that entrusted its arrestees to county with knowledge of unconstitutional strip

11

search policy could be held liable under § 1983 for injury arising out of arrestee's exposure to the search); *Ancata v. Prison Health Services, Inc.*, 769 F.2d 700, 705 & n.9 (11th Cir. 1985) ("Where a governmental entity delegates the final authority to make decisions then those decisions necessarily represent official policy")). Courts around the country have adopted similar reasoning that such an express agreement between two agencies obligates both agencies to ensure the constitutionality of the other's policies.[4]

Here, as in *Ford*, Watertown has had an "express agreement between the City and the County" in which "the County agreed to 'take custody of and house'" WPD arrestees at the Jail in a section of the Jail known as "the Police Lock-Up." *Compare Ford*, 154 F. Supp. 2d at 148 *with* Pl. 56.1. ¶¶ 138-140. Also as in *Ford*, "the City effectively used the County Jail as its own facility for almost a decade." 154 F. Supp. 2d at 150; Pl. 56.1 ¶ 138. The Jail and the WPD worked together to develop "all policies governing the management of the Police Lock-Up." Pl. 56.1 ¶ 144. Included in the specific Watertown Police Lock-Up policies is a policy requiring all arrestees to undergo a visual body cavity search upon intake. *Id.* ¶ 147. Jail Administrator Spencer confirmed he has shared Police Lock-Up policies with the WPD and has regularly had meetings with the WPD about jail policies affecting WPD arrestees. *Id.* ¶ 144. Here Watertown and Chief Donoghue are "liable in damages for the unconstitutional search[]," *Ford*, 154 F. Supp. 2d. at 145, of Ms. LeTray conducted pursuant to joint WPD and Jefferson County policy.[5]

---

[4] *See, e.g.*, *Trujillo v. City & Cnty. of Denver*, No. 14-cv-02798-RBJ-MEH, 2016 WL 5791208, at *14 (D. Colo. Sept. 7, 2016) (adopting reasoning of *Ford* and *Young*); *de la Torre v. La Plata Cnty.*, Civil Action No. 21-cv-01422-CMA-NRN, 2022 WL 1193471, at *5-6 (D. Colo. Feb. 11, 2022) (same); *Titus v. Cnty. of L.A.*, No. CV 06-3690 (SVW)(AJW), 2006 WL 8443072, at *4 (C.D. Cal. Oct. 18, 2006) (same, noting that "[t]his theory does not render a municipality vicariously liable for every unconstitutional act perpetrated by [county] entities, but only those supported by the organization's policy, practice, or custom").

[5] If Chief Donoghue argues he was unaware of the WPD's and the Jail's policy of subjecting all WPD arrestees in the Police Lock-Up to a blanket visual cavity strip search, such claims are implausible and irrelevant as a matter of law. *See* Pl. 56.1 ¶ 165-167 (confirming that Officers Cummings and White were aware every WPD arrestee is strip searched at the jail and in 2017 at least 230 WPD arrestees had visual cavity searches at the jail, which was during

In moving to dismiss, Chief Donoghue and Watertown argue that they cannot be liable because Chief Donoghue was not "present for the alleged strip search," because "Watertown does not set policy for the Jefferson County Jail," and because state laws *permit* (but do not require) Watertown to transfer custody of its arrestees to the Jail. WPD Br. at 10-11. These arguments misstate the facts and the law. First, WPD mischaracterizes the undisputed factual record, which establishes that "all policies governing the management of the Police Lock-Up" are developed in consultation with *both* the Jail and the WPD. Pl. 56.1 ¶ 144. Second, it is undisputed that Watertown—and Chief Donoghue as the official with ultimate policymaking power—have made a considered choice to enter into and continue to maintain a formal agreement with the County Jail to house WPD arrestees, thereby knowingly subjecting those arrestees to an unconstitutional visual cavity strip-search pursuant to formal policy.[6]

For all these reasons, based on the undisputed facts in the record, summary judgment is appropriate as to the City of Watertown and Chief Donoghue. "To permit the city to escape liability in this case would be to sanction willful disregard of municipal obligations," *Ford* 154 F. Supp. 2d at 150, and WPD's arguments to the contrary all fail as a matter of law.

---

Donoghue's tenure). It is not Ms. LeTray's burden to prove Chief Donoghue's actual knowledge when, as here, his lack of awareness would amount to "deliberate indifference" sufficient to trigger liability. *See, e.g., Ford* 154 F. Supp. 2d at 148-149, 150 (the city cannot "bury its head in the sand and ignore the manner in which the county treated . . . arrestees" and has "an affirmative obligation . . . to ensure that the policy of the Jail officials did not" violate arrestees' rights); *see also Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) (holding municipality liable where the unconstitutional practice is "so manifest as to imply the constructive acquiescence of senior policy-making officials").

[6] It is also undisputed, although not necessary for Ms. LeTray to establish, that WPD is not legally required to maintain its current agreements with the Jail. Among other options, it could advocate for a change in policy pursuant to the parties' agreements, utilize alternative police lock-up spaces which Chief Donoghue testified the WPD has previously used, utilize other space within the police department, or order police officers to stay with the arrestees until their arraignment. *See* Pl. 56.1 ¶ 163; *see also* Crim. Proc. Law § 140.20 (listing police department's options for processing, holding, and releasing the people it arrests).

**II.**      **SUMMARY JUDGMENT FOR WPD ON MS. LETRAY'S EQUAL PROTECTION AND CRL § 40-C CLAIMS IS PRECLUDED BY MATERIAL FACTUAL DISPUTES.**

**A.  Regarding Ms. LeTray's Federal & State Equal Protection Claims, WPD Relies on Inapposite False Arrest and Malicious Prosecution Doctrine.**

Defendants contend that Ms. LeTray's equal protection claims "must be dismissed because Plaintiff pled guilty to three reduced charges arising out of the events of September 28, 2017," WPD Br. at 12,[7] citing a rule that applies to false arrest and malicious prosecution claims, which Ms. LeTray did not bring. Instead, Ms. LeTray's claims sound in equal protection—differential treatment—which WPD's motion does not address.

WPD's argument turns on *Heck v. Humphrey*, where the Supreme Court held that a Section 1983 claim for an "allegedly unconstitutional conviction or imprisonment" cannot be sustained where the basis of the claim is a valid conviction. *See* 512 U.S. 477, 486-87 (1994). Defendants cite two *pro se* cases, both primarily asserting claims for false arrest and malicious prosecution, that were dismissed explicitly for asserting generalized claims challenging convictions that had not been reversed, expunged, or declared invalid in violation of *Heck*. *See Duamutef v. Morris*, 956 F. Supp. 1112 (S.D.N.Y. 1997) (dismissing *pro se* plaintiff's challenge to his conviction under *Heck* because the underlying conviction was valid); *Oliver v. Tepperman*, No. 08-CV-3685 (RRM)(LB), 2010 WL 889276 (E.D.N.Y. 2010) (same)). But here, Ms. LeTray does not argue that her arrest or conviction was unconstitutional. Rather, Ms. LeTray argues that the *manner* in which Defendants treated her during her arrest, booking, and detention violates the federal and state Equal Protection Clauses and CRL § 40-c. Courts analyze such claims using an equal protection framework. *See, e.g.*, *Adkins v. City of New York*, 143 F. Supp. 3d 134, 138

---

[7] Plaintiff and Watertown Defendants entered into a stipulation agreeing to the voluntary dismissal of Virginia Sherrill née Kelly. *See* ECF Dkt. No. 105. Watertown Defendants submitted a summary judgment motion on behalf of Virginia Sherrill, ECF Dkt. No. 93, but that motion is now moot and Plaintiff responds only to ECF Dkt. No. 94.

(S.D.N.Y. 2015) (court conducted Equal Protection analysis of transgender arrestee's allegations that NYPD treated him differently because of his gender identity). Therefore, *Heck*, *Duamutef*, and *Oliver* are inapposite.

### B.  There Are Genuine Factual Disputes About Whether WPD Violated Plaintiff's Equal Protection Rights Precluding Summary Judgment.

Ms. LeTray's federal and state law Equal Protection claims[8] must demonstrate that she "was treated differently than others similarly situated as a result of intentional or purposeful discrimination[, and] show that the disparity in treatment cannot survive the appropriate level of scrutiny." *Adkins*, 143 F. Supp. 3d at 138 (quoting *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005); *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985)); *see also Vega v. Artus*, 610 F. Supp. 2d 185, 209 (N.D.N.Y. 2009) (finding plaintiff plausibly alleged equal protection violation against one defendant on basis of perceived homosexuality and differential treatment). Here, there are key factual disputes about whether WPD subjected Ms. LeTray to intentional discrimination based on her sex and transgender status, and that discrimination would not survive the heightened scrutiny triggered by such treatment.

### i.  A Reasonable Jury Could Conclude that Defendants Treated Plaintiff Differently Than Cisgender People Who Are Detained Pre-Trial.

For the purpose of determining whether a plaintiff was "treated differently than others similarly situated," multiple courts have found that transgender people who are arrested or detained by police and corrections officers can satisfy this prong of the equal protection analysis by showing that they were subjected to verbal and physical harassment based on their gender identity, that they were misgendered, or that they were otherwise singled out for differential

---

[8] Courts evaluate the federal and state equal protection claims identically, so they are analyzed here together. *See Brown v. State*, 89 N.Y.2d 172 (1996) (Under the New York Constitution, the Equal Protection Clause "afford[s] coverage as broad as that provided by the Fourteenth Amendment to the United States Constitution"); *see also Hernandez v. Robles*, 7 N.Y.3d 338, 362 (2006) (regarding sex discrimination).

treatment that their similarly situated cisgender peers were not subjected to. In *Hampton v. Baldwin*, No. 3:18-CV-550-NJR-RJD, 2018 WL 5830730, at *112 (S.D. Ill. Nov. 7, 2018), a transgender woman subjected to "constant, severe harassment" established "a likelihood of success on the merits of her equal protection claim with regard to verbal and physical sexual harassment." And in *Adkins*, the NYPD removed a transgender detainee and "held him by himself in more deleterious conditions" than cisgender detainees, including being "handcuffed to a wall without food." 143 F. Supp. 3d at 138. The court in *Adkins* held that a plaintiff's allegations of officers "handcuffing [transgender detainees] to railings" and "gawking, giggling, and inquiring about [the plaintiff's] genitalia" made out a claim for being "treated differently than others similarly situated as a result of intentional or purposeful discrimination," in violation of the Equal Protection Clause. *Id.* at 138, 142; *see also Doe v. Mass. Dep't of Correction*, No. 17-12255-RGS, 2018 WL 2994403, at *10 (D. Mass. June 14, 2018) (finding that a transgender woman satisfied this prong because she was "treated differently from other female prisoners in the Massachusetts penal system").

While there are limitations on equal protection claims arising solely from "verbal harassment," *Vega*, 610 F. Supp. 2d at 209, when "verbal harassment and simultaneous physical abuse . . . are considered together," courts have "conclude[d] that plaintiff's allegations were sufficient to state a § 1983 claim for discrimination," *Cole v. Fischer*, 379 F. App'x 40, 43 (2d Cir. 2010) (summary order); *see also Ali v. Connick*, 136 F. Supp. 3d 270, 276 (E.D.N.Y. 2015) ("[W]here verbal statements are accompanied by an appreciable injury, an equal protection claim may be cognizable."); *Baskerville v. Goord,* No. 97–CV–6413, 1998 WL 778396, at *7 (S.D.N.Y. Nov. 5, 1998) ("Where . . . such statements are shown to be connected with physical injury, a § 1983 claim may indeed lie.") *aff'd sum nom. Baskerville v. Mulvaney,* 411 F.3d 45 (2d

16

Cir. 2005). Additionally, where verbal harassment or abuse causes "psychological pain," this "constitute[s] an 'appreciable injury' that makes [it] actionable." *Willey v. Kirkpatrick*, 801 F.3d 51, 70 (2d Cir. 2015) (noting how verbal harassment could have caused "psychological pain and resulting suicide attempt").

Here, Ms. LeTray was subjected to differential treatment in the form of derogatory comments, misgendering, misclassification as a "man," and physical assault based on her gender identity, resulting in physical and psychological injury. Pl. 56.1 ¶¶ 97, 100-01, 103, 109, 112, 117, 122, 124, 128, 131. Ms. LeTray has submitted an expert report explaining that transgender people like her are routinely singled out for differential treatment, describing how WPD's policies and practices are discriminatory toward transgender people, and concluding that she has experienced severe psychological injury as a result. *Id.* ¶¶ 183.

As to Defendants Cummings and White, Ms. LeTray testified that both officers: repeatedly used male pronouns to refer to her, even after she repeatedly stated that that she used female pronouns, *id.* ¶¶ 97, 100, 112; made derogatory comments about her, including stating that she was "a man dressed like a woman" and saying to her, "you are a guy dressed like a woman," *id.* ¶¶ 101, 112; created arrest records that identified Ms. LeTray as "male" and included male pronouns, *id.* ¶ 106; and failed to use Ms. LeTray's name despite knowing she used a feminine name and writing "DeAnna LeTray" in as her "alias" on her arrest paperwork, *id.* ¶¶ 106-112.

There is also evidence to support the inference that Officers Cummings and White treated Ms. LeTray differentially during the forced removal of her wig, which is a central component of her gender identity and presentation. *Id.* ¶ 80-81. Even though individuals who wear eyeglasses are permitted to take a photo with and without the glasses, *id.* ¶ 116, and people who wear

synthetic hair like a weave are not required to remove it, *id.* ¶¶ 116, 118, Ms. LeTray was not permitted to take a photo both with and without her wig, *id.* ¶¶ 117, 128. Cummings instead testified that he wanted "an accurate depiction of [Plaintiff's deadname]," who "was a male." *Id.* ¶ 75. Ultimately, Officer Cummings forcibly removed her wig, slamming Ms. LeTray to the ground and ripping off some of her natural hair from her scalp. *Id.* ¶ 128.

As to Chief Donoghue, there is evidence that his adoption and maintenance of discriminatory policies and practices directly resulted in the differential treatment of Ms. LeTray on the basis of her gender identity. Chief Donoghue, as the head of the WPD, personally approves, maintains, and enforces its policies, *id.* ¶¶ 59-71, and he testified that, for the purposes of all policies that treat people in custody differently based on sex, a transgender woman "is a male," *id.* ¶ 75 (describing search and transport policies that treat transgender women differently than cisgender women by classifying them as "male"). This evidence supports the inference that, when Officers Cummings and White repeatedly misgendered Ms. LeTray, subjected her to differential treatment based on her gender identity, and classified her in WPD records as "male," *id.* ¶ 106, they were acting pursuant to the policy created and enforced by Chief Donoghue. All of Ms. LeTray's arrest and booking records regarding this incident continue to reflect incorrect gender pronouns, *id.*, whereas the arrest and booking documents of cisgender people have the correct gender pronouns, *id.* ¶ 75; ECF No. 94-01, ¶¶ 25-26. Indeed, subsequent investigations conducted by the WPD and ultimately overseen by Chief Donoghue include the same misgendering and improper use of her name long after WPD became aware of her gender identity. *Id.* ¶ 79.

WPD neither discusses nor acknowledges any of this relevant evidence of differential treatment, instead arguing in a conclusory sentence that Ms. LeTray "has no evidence" that her

"arrest was based on her transgender status." WPD Br. at 12. This argument misses the point. While Ms. LeTray has testified that Officer Cummings indicated he would let her go home before reversing that decision and stating that he could not let her "walk the streets looking and dressed like that," meaning like a transgender woman, Pl. 56.1 ¶¶ 102-103, here the substance of her equal protection claim does not concern false arrest or malicious prosecution. *See* Part II(A) *supra.* Rather, she challenges WPD's *differential treatment* of her because she is a transgender woman. She has presented voluminous evidence that a reasonable jury could use to conclude that she experienced such differential treatment.

WPD argues that Ms. LeTray has no evidence "that others have committed comparable conduct and not been prosecuted," WPD Br. at 13, citing *Poole v. Hawkins*, No. 18-CV-443 (MKB), 2021 WL 695119 (E.D.N.Y. 2021). Leaving aside—again—that she alleges differential treatment across a wide array of incidents *not* involving the decision to prosecute her, *Poole* is an inapposite case where the plaintiff failed to include "any factual allegations suggesting that his differential treatment by Defendants was the result of 'impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure' him," *id.* at *9. Here, Ms. LeTray relies on numerous facts indicating WPD's differential treatment because of her transgender status.

### ii. Heightened Scrutiny Applies.

The second prong of the Equal Protection analysis requires the court to consider whether that differential treatment survives "the appropriate level of scrutiny." *Adkins*, 143 F. Supp. 3d at 138. WPD's actions here are subject to "heightened scrutiny" (also known as "intermediate scrutiny") for two reasons. First, differential treatment based on sex triggers heightened scrutiny, *United States v. Virginia*, 518 U.S. 515, 533 (1996), and the Supreme Court in *Bostock v. Clayton County, Georgia* confirmed that gender-identity discrimination is a form of sex

discrimination, 140 S. Ct. 1731, 1743 (2020).[9] Second, courts have also held that transgender people constitute a suspect or "quasi-suspect class," a constitutional classification that also triggers heightened scrutiny. *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 607 (4th Cir. 2020), *as amended* (Aug. 28, 2020) (finding heightened scrutiny applied to differential treatment of transgender student on this basis). Here, as in *Grimm*, WPD's discriminatory conduct, practices, and policies are subject to heightened scrutiny because they "rest[] on sex-based classifications *and* because transgender people constitute at least a quasi-suspect class." 972 F.3d at 607.

### iii. Watertown Defendants Assert No Interest Whatsoever in the Differential Treatment of Transgender Arrestees and Thus Fail Heightened Scrutiny.

To defend its policies and practices under heightened scrutiny, the government bears the "demanding" burden to show (1) an "exceedingly persuasive" justification that is "genuine, not hypothesized or invented post hoc in response to litigation" and does "not rely on overbroad generalizations," and (2) that "the discriminatory means employed are substantially related to the achievement of [the government's] objectives." *Virginia*, 518 U.S. at 533 (internal citations and quotation marks omitted); *see also Windsor v. U.S.*, 699 F.3d 169, 185 (2012). Any government interests that amount to "generalized concerns for prison security . . . are insufficient to meet the 'demanding' burden . . . to justify sex-based classifications." *Doe*, 2018 WL 2994403, at *10 (citing *Virginia*, 518 U.S. at 531); *see also Hampton*, 2018 WL 5830730, at *11.

Here, WPD has not attempted to justify the conduct, policies, and practices that led to

---

[9] Prior to *Bostock*, lower courts routinely held that gender-identity-based discrimination is a form of sex discrimination. *See, e.g.*, *Schwenk v. Hartford*, 204 F.3d 1187, 1200-02 (9th Cir. 2000); *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017); *Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011); *Smith v. City of Salem, Ohio*, 378 F.3d 566, 577 (6th Cir. 2004); *Fabian v. Hosp. of Cent. Conn.*, 172 F. Supp. 3d 509, 527 (D. Conn. 2016); *Schroer v. Billington*, 577 F. Supp. 2d 293, 308 (D.D.C. 2008).

Ms. LeTray's discrimination and differential treatment under *any* level of scrutiny—let alone under heightened scrutiny's "demanding" burden. WPD disputes the underlying facts, WPD Br. at 12, but WPD has asserted no interest in treating transgender women differentially by misgendering them, incorrectly using male pronouns to refer to them, harassing them, subjecting them to humiliating booking procedures not endured by cisgender peers, or physically assaulting them. Even if WPD had asserted an interest in such discrimination, it would necessarily rely on disputed factual assertions about that justification, making summary judgment inappropriate.

### iv.    A Reasonable Jury Could Conclude That the City of Watertown is Liable for Equal Protection Violations Under Monell.

WPD argues that Ms. LeTray's federal Equal Protection claim should be dismissed against the City of Watertown, WPD Br. at 12, but cannot establish that it is entitled to judgment as a matter of law under *Monell.* Pursuant to *Monell*, to establish municipal liability, a plaintiff can rely on evidence showing: "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007). WPD fails entirely to meet its burden to show entitlement to judgment as a matter of law on this issue.

On the first prong, Ms. LeTray could prevail on two separate theories of *Monell* liability: that Watertown has adopted a formal official policy endorsed by its chief policymaker of treating a transgender woman as "a male" for the purpose of all sex-specific policies, *see* Pl. 56.1 ¶¶ 75, 77; *Weber*, 804 F.2d at 803 (finding "highest ranking law enforcement official" in an agency was policymaker for *Monell* purposes); and that WPD has failed to conduct any trainings to instruct WPD officers on the rights and proper treatment of transgender people, *id.* ¶¶ 60, 68-69, despite a history of officers encountering Ms. LeTray over several years during her gender transition, Pl. 56.1 ¶ 114, and thus this failure exhibits deliberate indifference, *see Outlaw v. City of Hartford*,

884 F.3d 351, 372 (2d Cir. 2018) (in addition to a formal official policy, failure to train can satisfy first prong when it shows deliberate indifference on the part of the municipality).

On the second prong—causation—a reasonable juror could find that, when WPD officers repeatedly misgendered Ms. LeTray, subjected her to differential treatment based on her gender identity, and classified her in WPD records as "male," they were acting pursuant to the official policies or customs of the WPD and had not been trained to act otherwise. On the third prong, a reasonable juror could likewise conclude that these acts violated equal protection. For all these reasons, WPD is not entitled to summary judgment on Ms. LeTray's *Monell* claim here.

### C. On Ms. LeTray's Eighth Claim, WPD Is Not Entitled to Summary Judgment Because There Are Genuine Factual Disputes About Whether WPD Violated New York State Civil Rights Law § 40-c.

Defendants also move for summary judgment on Ms. LeTray's CRL Section 40-c claim. As a threshold matter, Defendants fail to discuss anything about this claim beyond the unsupported assertion that it "should be dismissed." *See* WPD Br. at 12. But, as discussed below, there are genuine factual disputes hinging on WPD's discriminatory treatment of Ms. LeTray that preclude summary judgment.

CRL Section 40-c prohibits "discrimination in [a person's] civil rights. . . by any other person . . . or by the state or any agency or subdivision of the state" on the basis of a person's sex, gender identity or expression, or disability.[10] To establish a violation, a plaintiff can show either "(1) that he was subjected to discrimination of his civil rights, *or* (2) that he was subjected to harassment while exercising his civil rights." *Pratt v. Indian River Cent. Sch. Dist.*, 803 F.

---

[10] Pursuant to New York law, discrimination on the basis of gender identity, gender expression, and actual or perceived gender dysphoria constitute prohibited sex and disability discrimination. 9 N.Y.C.R.R. § 466.13. Accordingly, Ms. LeTray's CRL Section 40-c claims are further supported by evidence in the record that Ms. LeTray has a diagnosis of gender dysphoria, that her discrimination at the hands of the WPD was inconsistent with the proper treatment of individuals with gender dysphoria, and that she suffered harm as a result. Pl. 56.1 ¶¶ 49, 54.

Supp. 2d 135, 150 (N.D.N.Y. 2011). Discrimination claims made pursuant to CRL Section 40-c, which names the same protected categories as the New York State Human Rights Law ("NYSHRL") while covering certain different entities, are evaluated under the same standard as those made under the NYSHRL. *See Gordon v. PL Long Beach, LLC*, 74 A.D.3d 880, 885 (2d Dept. 2010) ("[F]acts sufficient to sustain a cause of action under Executive Law § 296 will support a cause of action under Civil Rights Law § 40–c.") (citations omitted).

New York courts have confirmed that misgendering a transgender woman, misclassifying her as "male," and subjecting her to derogatory or harassing behavior based on her gender identity violate CRL Section 40-c. In *Doe v. City of New York*, 42 Misc. 3d 502, 506-507 (N.Y. County Sup. Ct. 2013), the court held that refusing to update a transgender woman's City-issued records to reflect her name and gender violated state anti-discrimination law, and specifically held that "the purposeful use of masculine pronouns in addressing [a person] who presented as female [. . .] is not a light matter, but one which is laden with discriminatory intent." And in *Wilson v. Phoenix House*, the court found that discrimination against a transgender woman constituted sex discrimination and disability discrimination under New York law, based in part on allegations that the plaintiff was classified as a man at a residential treatment center acting as an alternative to incarceration. 42 Misc. 3d 677, 685-703 (N. Y. County Sup. Ct. 2013). In addition to these squarely relevant state cases, federal cases such as *Bostock* and *Grimm* also confirm that the conduct Ms. LeTray experienced at the hands of WPD constitutes prohibited sex and gender identity discrimination. *See, e.g.*, *Aurecchione v. New York State Div. of Hum. Rts.*, 771 N.E.2d 231, 233 (N.Y. 2002) (looking to federal case law when state discrimination laws "address the same type of discrimination").

Here, as discussed at length in Section II(B)(i), there is significant evidence upon which a

reasonable juror could rely to conclude that WPD discriminated against Ms. LeTray, including in the specific manner cited by the courts in *Doe*, 42 Misc. 3d 502, 506-07 (the "purposeful use of masculine pronouns"), and *Wilson*, 42 Misc. 3d at 680-82 (misclassification as a man). Accordingly, WPD is not entitled to summary judgment on this claim.

## III.     **INJUNCTIVE RELIEF IS AN APPROPRIATE REMEDY.**

Without citing any authority, WPD argues that this Court has no basis to grant Plaintiff's request for injunctive relief ordering them to identify records concerning Ms. LeTray and "[c]orrect those records to properly identify Ms. LeTray as a woman, not a man." WPD Br. at 13-14. In support, WPD notes only that, as of 2017, Ms. LeTray still used her deadname on various legal documents and had not yet formally gone through the statutory New York name change process. *Id*. Defendants do not articulate any legal theory as to why these facts preclude the requested relief, and they are incorrect that they do.

A plaintiff has standing to seek injunctive relief so long as she identifies an injury that is concrete, particularized, and actual or imminent as well as fairly traceable to the challenged action and redressable by a favorable ruling. *Deshawn v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998). Seeking amendment of records is not an extraordinary form of injunctive relief, particularly where a transgender person seeks official records that accurately reflect their correct gender. *See Grimm*, 972 F.3d at 600 (transgender student who succeeded on Equal Protection and Title IX claim entitled to amendment of school records to reflect his gender as male), *cert. denied*, 141 S. Ct. 2878 (2021). In *Grimm*, even though the records were historical and the plaintiff was no longer a student, the court found that he was entitled to an update because 1) the ongoing refusal "treats him worse than other students, whose records reflect their correct [current] sex," and 2) there is ongoing "harm" based on third parties who may view the records in the future. *Id.* at 619.

If, as in *Grimm*, Ms. LeTray succeeds on her claim that WPD "treat[ed] her worse than

other" arrestees, she could similarly be entitled to "records reflecting [her] correct sex," which appears on her current valid government-issued ID alongside her legal name, "DeAnna LeTray." *See* Pl. 56.1 ¶ 79 (Ms. LeTray's current driver's license). And because WPD records continue to misidentify Ms. LeTray as "male" to all WPD employees who currently have access to them, *see* Pl. 56.1 ¶ 106 (Ms. LeTray's arrest records), as well as to outside entities who will request them in the future, she continues to experience the same harm identified in *Grimm*.[11] Accordingly, this Court should not grant WPD's request to preclude the possibility of injunctive relief.

## CONCLUSION

For all these reasons, the Court should grant Ms. LeTray's motion and deny WPD's motion.

---

[11] In addition, Ms. LeTray has already been forced to interact directly with WPD multiple times since 2017 during various stops and police incidents, Pl. 56.1 ¶ 79, concrete examples of occasions during which the agency's continued use of records identifying her as "male" present opportunities for misgendering and ongoing harm. Given the small size of Watertown and this history of ongoing police encounters, the potential harms flowing from WPD records that continue to misidentify her as "male" are significantly exacerbated.

Dated: December 16, 2022
New York, NY

Respectfully submitted,

/s/ Jessica Perry
Jessica Perry (702461)
Veronica Salama (703812)
Robert Hodgson (518648)
Molly K. Biklen (4295390)
Attorneys for Plaintiff
NEW YORK CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 19th Floor
New York, New York 10004
Tel: +1 (212) 607-3300
Fax: +1 (212) 607-3318
E-mail: jperry@nyclu.org
vsalama@nyclu.org
rhodgson@nyclu.org
mbiklen@nyclu.org

/s/ Joshua Cotter
Joshua Cotter (518217)
Samuel C. Young (508916)
Attorneys for Plaintiff
LEGAL SERVICES OF CENTRAL NEW
YORK, INC.
221 South Warren Street, 3rd Floor
Syracuse, New York 13202
Tel: +1 (315) 703-6500
Fax: +1 (315) 703-6520
E-mail: jcotter@lscny.org
samyoung@lscny.org